**JOHN T. BAZZURRO, ESQUIRE-JB-1838**
**LAW OFFICES OF JOHN T. BAZZURRO, LLC**
200 Meco Drive
Millstone Township, New Jersey 08535
(732) 410-5350
Attorneys for Plaintiff

| | |
|---|---|
| **SUSAN LASK,** | **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY** |
| Plaintiff, | **NEWARK VICINAGE** |
| vs. | Civil Action Number: 21-CV-_20781_ |
| **ROYAL BUCKINGHAM CONDOMINIUM ASSOCIATION, INC., a Non-Profit Corporation of New Jersey; ROBERT PERLMAN, COLOMON DE HEGEDUS a/k/a COLOMON DE HEDGEDUS, WENDY SEGAL, CATHERINE BLUMENTHAL, ANGELO AVELLO, CHARLOTTE ERMOIAN, VERDE, STEINBERG & PONTELL, LLC and "JOHN DOES"** (1-23) (being fictitious names, of which the true identities will be discovered during litigation), | **COMPLAINT AND JURY DEMAND** |
| Defendants | |

Plaintiff, Susan Lask, by way of complaint against Defendants, by her counsel, says:

**<u>INTRODUCTION</u>**

It is a fundamental law in New Jersey that a Condominium Association shall exercise its powers and discharge its functions in a manner that protects and furthers or is not inconsistent with health, safety and general welfare of the residents of the community (NJCA §46:8B-14 (j)). However, as this case shows, the Royal Buckingham Condominium has been hijacked for years by Defendants pretending to be the Board of Directors of the Association as they misappropriate funds, engage in self-dealing and use Association funds, property and supplies to operate an illegal cabinet making business for profit in the condominium basement.  When Plaintiff and

other owners complain about Defendants illegal conduct, Defendants viciously engage in verbal and physical assaults, vandalize their property and illegally file false police reports to harass and intimidate owners from enforcing their rights under the law.

As a result of Defendants illegal conduct, on October 20, 2020 the State of New Jersey issued an Order for Defendants to cease their illegal activities.  Because Defendants arrogantly ignore the Order, in August, 2021 the New Jersey Attorney General filed an action against the Association, comprised of the Defendants.  Defendants have misappropriated some $80,000 from the Association to pay needless legal fees attacking the very law they are mandated to follow, all to Plaintiff's detriment as money meant for the building is used for Defendants' profit and self-interests in maintaining control illegally over the building, while the building falls in disrepair.

This case seeks injunctive and other relief and damages to stop the hostile takeover of the building by Defendants and hold them accountable for their years of illegal conduct.

## PARTIES

1.  Plaintiff Susan Lask owns a residential unit at the Royal Buckingham Condominium (the "Condominium") at 900 Palisade Avenue, Fort Lee, New Jersey and is a member of Defendant ROYAL BUCKINGHAM CONDOMINIUM ASSOCIATION, INC. (the "ASSOCIATION").

2.  Defendant ASSOCIATION is a New Jersey non-profit corporation and condominium association with a principal office at 900 Palisade Avenue, Fort Lee, New Jersey, created under and operating pursuant to (a) the New Jersey Non-Profit Corporation Act, N.J.S.A. 15A:1-1, *et seq.*, (b) the New Jersey Condominium Act,  N.J.S.A. 46:8B-1, *et seq.*, by a Certificate of Incorporation filed July 7, 1994 with the New Jersey Treasury Department, (c) the "Planned Real Estate Development Full Disclosure Act" ("PREDFDA") encompassed in N.J.S.A. 45:22A-45 *et seq.* , which directs how Associations conduct nominations, votes and meetings for its Board of

Directors and (d) the ASSOCIATION operates under its Amended and Restated By-Laws (amended through September 6, 2012) (the "By-Laws").

3.  The ASSOCIATION is responsible for the administration and operation of the building and maintenance, repair, and replacement of the common elements in the Condominium that was created by a master deed, recorded in the Office of the Bergen County Clerk on June 24, 1994 in Deed Book 7707, page 210, *et seq*.

4.  Owners of Condominium units are members of the Association, with rights to the Condominium and Association pursuant to the New Jersey Non-Profit Corporation Act, the New Jersey Condominium Act, PREDFDA and the Association's By-Laws.

5.  Defendants **ROBERT PERLMAN**, **COLOMON DE HEGEDUS, WENDY SEGAL, CATHERINE BLUMENTHAL** and **CHARLOTTE ERMOIAN** reside and are domiciled at Condominium units 19C, 19M, 1A, 11L and 12B, respectively,  **JOHN DOE(S) 1-20** are unit owners, and all defendants are ASSOCIATION member with **PERLMAN**, **DE HEGEDUS, SEGAL, BLUMENTHAL and DOE(S)**  acting as its directors and/or officers.

6.  Defendants **ANGELO AVELLO** and **CHARLOTTE ERMOIAN** are employees, servants and/or agents of the ASSOCIATION serving as managing agents of the Condominium in Fort Lee, New Jersey, and their salaries and other benefits are paid from ASSOCIATION funds that Plaintiff pays in to.

7.  Defendant **VERDE, STEINBERG & PONTELL, LLC** ("**VERDE-STEINBERG**") has a principle place of business at 19 Main St, Hackensack, NJ 07601, holds itself out as experienced condominium law lawyers and are paid from ASSOCIATION funds, that Plaintiff pays in to, to provide legal advice to the ASSOCIATION, which includes protecting the ASSOCIATION and Condominium's interests.

**JURISDICTION AND VENUE**

8.   This Court has original jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. §1332 in that Plaintiff is a resident and domicile of a State different from all of the Defendants who are residents and domiciles of New Jersey, and the amount of controversy exceeds the monetary limits required by 28 U.S.C. §1332.

9.   The Court has "federal question" subject matter jurisdiction pursuant to 28 U.S.C. §1331 as the claims arise under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. s 1961 *et seq.* and 18 U.S.C. §1964, and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq.*   Jurisdiction over the pendent state claims exists pursuant to 28 U.S.C. §1367(a) as they are part of the same case and controversy.

10. Declaratory and injunctive relief is available under 28 U.S.C. §§2201 and 2202 and RICO's 18 U.S.C. §1964.

11. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial amount of the events or omissions and the property is located in Bergen County, New Jersey, which is within the jurisdiction of this Court.

**FACTUAL BACKGROUND**

**DEFENDANTS' YEARS OF FRAUDS & MISPPROPRIATION LEADS
OWNERS TO PETITION TO REMOVE DEFENDANTS FROM THE BOARD
& MANAGEMENT, BUT DEFENDANTS VICIOUSLY RETALIATE**

12.   In November, 2019, Condominium resident Suzanne Toufayan contacted Plaintiff to attend a November 19, 2021 meeting Toufayan organized regarding Defendants mismanagement and frauds.  Plaintiff never knew Toufayan before that contact.  Attending Toufayan's meeting was Toufayan, her husband, Howard Meltzer, Eric Barsegian, Betty Cherkezian and her husband, Plaintiff and other owners, where Plaintiff heard them complain that:

(a) Defendants operate an illegal cabinet making business/wood-shop in the Condominium basement by misappropriating ASSOCIATION supplies and funds;

(b) Defendant ERMOIAN, an owner who works part-time in the management office, gets free exclusive top level garage parking while all owners pay $105.00 monthly parking fees;

(c) Defendant AVELLO  (i) takes a hefty salary and benefits from the ASSOCIATION, (ii) uses contractors at the ASSOCIATION's expense who repay him with favors,  (iii) is absent from work, never returns calls, and  (iv) had another job for years while taking a full-time salary from the ASSOCIATION; and

(d) Toufayan complained AVELLO and his agents vandalized her car after she complained about his  mismanagement.

13.    Toufayan encouraged everyone to attend a November 21, 2019 ASSOCIATION meeting to voice their complaints, but there Defendants refused to address complaints as they customarily ignore owners complaints for years to keep control of the Association under their reign where they were never legally voted for in violation of state laws.

14.    At the meeting, Defendant PERLMAN, holding himself out as the Board of Director President, announced that Defendants will remain the Executive Board; however,  a vote was not held nor has there been nominations, notice of meetings or a vote by the 183 owners in the building for over six years and to date for an Executive Board or Board of Directors.

15.    After Defendant PERLMAN announced that fraudulent "vote",  Plaintiff stated Defendants are violating N.J.S.A.45:22A-43 (referred to as the Radburn Act) created in 2017 to prevent exactly the illegal and undemocratic voting scheme Defendants engage in as Radburn mandates owners the right to receive prior notice to nominate candidates, vote for a Board at a meeting and the votes must be tabulated in a certain way.

16.    Despite Radburn's  directives, Defendant VERDE-STEINBERG's Jameson Van Eck, Esq., holding itself out as experienced condominium lawyers, responded by misrepresenting that the ASSOCIATION By-Laws "trump State laws", so Defendants will vote how they want.

17.    Next, Toufayan's husband, an elderly man in his 80s,  complained of  mismanagement and vandalism to his car by Defendant AVELLO.  In response, Defendant VERDE-STEINBERG's

Jameson Van Eck, a tall young man leaned forward to the elderly Mr. Toufayan, sitting a few

feet from him, and violently screamed "STOP STARING AT ME! YOU'RE HARASSING

ME!", at Mr.  Toufayan, which said outburst was meant to and did frighten attendees from

speaking, as Suzanne Toufayan's Text below of "Correct" to Plaintiff the next day confirms that

and Defendant PERLMAN's fraudulent vote at the meeting:



18.    An elderly woman in her 80's, who sat behind Plaintiff, was so frightened she asked

Plaintiff to call her.  In a recorded call the next day, the woman confirms her fears of retaliation

by Defendants who are always "hostile", "angry" and scream at residents (**Exhibit A -**Transcript

& recording at https://www.youtube.com/watch?v=Y3TYE5VANJc).

19.    In December, 2019,  owner Fiana Bezpalko organized a meeting for owners to voice their

complaints about Defendants, which **DEFENDANT**s 18th floor Board Member Rajiv Lakhaney

appeared and stated there, and numerous times thereafter by phone to Plaintiff, that:

(a) he was never voted in as a Board Member yet holds that title,

(b) never receives notices from DEFENDANTS of Board of meetings for him to attend and vote,

(c) has no access to the Executive Board;

(d) does not know the identity of the Board members;

(d) never signed the "Director's Ethics Pledge" mandated by the ASSOCIATION By-Laws at Article II(a)(v), page 3, (e) does not know what his duties; and

(f) he complained of DEFENDANTs misconduct and mismanagement.

20.    Other owners contacted Plaintiff from 2020 to date, complaining of Defendants' thefts, frauds and mismanagement, as the below texts exemplify an attorney owner complaining about Defendants' thefts[1], Howard Meltzer that Defendants use VERDE-STEINBERG to conceal State complaints against them and use ASSOCIATION funds to pay unnecessary and excessive legal fees while the Condominium is in disrepair, and Ms. Bezpalko about Defendants' lies:



21.    On about March 4, 2020, Ms. Bezpalko obtained 33 signatures on the following petition:

### "COMMITTEE FOR A BETTER ROYAL BUCKINGHAM

The purpose of this committee is to take back control of our home values and community by (a) enforcing the state law, including the Radburn Act that gives us the right to nominate residents for the Board and vote for the Board and (b) gaining access to our financials so we can correct the financial waste and mismanagement of this Building so we can protect our property values.

I sign below in agreement to complete the above stated goals, including replacing the present board, management and vendors to make Royal Buckingham better."  **(Exhibit B)**

---

[1] The name is redacted as Defendants have and will retaliate against owners who are professionals, particularly attorneys whom they fear because of their knowledge of the law.

22.  The petition included Defendants 18th floor Board Member Rajiv Lakhaney's wife's signature (**Exh B**, #3), proving Defendants own Board Member objects to their misconduct.

23.  When Defendants learned of the Petition, they retaliated by threatening to sue owners using Defendant VERDE-STEINBERG, the very law firm ASSOCIATION members pay to protect their interests in the Condominium, not to use their funds to sue them for asking Defendants to follow state laws to vote for a Board that will protect the Condominium.

24.  In the second week of March, 2020, Ms. Bezpalko called Plaintiff to hear Defendants PERLMAN and AVELLO threaten a baseless lawsuit against Bezpalko, who later, in recorded calls and texts to Plaintiff, detailed their threats as "vile" and her March 4, 9 and 22, 2020 texts below address their lies, illegal cabinet business, refusal to provide her husband, Aleksander Vinokur, also an owner, financials and AVELLO's personal  attacks that she "has issues":



25.  In fact, from 2019 to 2021, Suzanne Toufayan continued to complain about Defendants illegal conduct and she retained counsel with Plaintiff, which on November 4, 2021, Toufayan signed a certification to a document she was going to file in court against Defendants detailing

their misconduct and illegal cabinet business (**Exhibit C**), as also detailed in recorded calls to Plaintiff, but in fear of Defendants retaliation Toufayan did not file the action.

26.    During 2019 to date, Defendants escalated their verbal and physical attacks by targeting Plaintiff and her property and causing Plaintiff and her property serious damage, including vandalisim as Ms. Toufayan experienced previously, because Plaintiff and Ms. Bezpalko sent proof of DEFENDANTs illegal operation in a December, 2019 complaint to New Jersey's Department of Community Affairs ("DCA") that commenced an investigation of Defendants.

**In October, 2020 New Jersey's DCA Filed an Order Against Defendants Illegal Conduct, and in August, 2021 the NJ Attorney General Filed a Complaint Against Defendants for Ignoring the State Order**

27.    On October 20, 2020, the DCA validated Plaintiff's complaints by issuing Defendants and their counsel, VERDE-STEINBERG,  a  "Notice of Violation and Order to Comply" (the "Order") (**Exhibit D**).

28.    The Order details Defendants illegal voting scheme in that the Condominium comprises 23 floors of 183 residential units, with each floor having 5 to 9 units of various sizes and values. The Order states that  the ASSOCIATION's By-Laws, Article II, Section I, creates a 23-member Board of Directors by limiting the 183 residents to vote <u>only</u> for a Board member on their floor, with no right to nominate or vote for Board members on any other floor, and this voting scheme applies to the various floors regardless of the size, value or number of units on each floor, which results in a 23-member Board that the By-Laws Article II, Section 3 limits <u>only</u> those 23-members to elect an Executive Board of the President, Vice-President, Secretary and Treasurer to operate the ASSOCIATION (**Exhibit E**-By-Laws).

29.    The Order states that the By-Laws article II, Sections 1 and 4, mandate annual Board elections for 7 or 8 of the 23 floors, scattered around the 3-year terms floor board members hold.

30.    The Order states DEFENDANTs illegal conduct violates numerous state laws under

PREDFDA, citing NJSA 45:22A-45a, A-45b and 45.2c(4) and (7) and 23r and NJSA 45:22A-

45.2f(3)(b) that prohibit Condominium Associations from preventing members from nominating

themselves or others for the Executive Board or voting for the Executive Board, and that

Defendants floor by floor election scheme violates those laws and Defendants have "no legal

basis to deviate from the standard voting requirements."

31.    The Order continues that Defendants and their counsel Defendant VERDE_STEINBERG

ignored the DCA's initial notices, and later Defendants told the DCA they will vote their way

and not as the State law directs, just as Defendants previously dictated to Plaintiff and the other

owners at the above described November 21, 2019 meeting.

32.    In August, 2021, the New Jersey Attorney General filed an action against Defendant

ASSOCIATION because of Defendants refusal to follow state voting laws.

33.    Despite the Attorney General action, PREDFDA and N.J.S.A. 45:22A-45.2c(7) requiring

all 183 Association members notice, rights to nominate candidates, vote and a proper tabulation

of votes for all directors on the board of directors, Defendants to date refuse to correct their By-

Laws and the Association's election scheme according to state law, which violates Plaintiff's

rights as a paying Association member to an Association that operates legally - not illegally.

34.    Moreover, Defendants wasted some $80,000 in ASSOCIATION funds paid to Defendant

VERDE-STEINBERG who profit from Defendants illegal conduct by charging unnecessary and

excessive fees rather than advise Defendants to comply with the law and advise Plaintiff and the

Association members of the law, not misrepresent the law as Defendants and VERDE-

STEINBERF constantly do whenever Plaintiff and owners ask that they follow the law.

**Defendants By-Laws Are Prohibited by State Law, and Defendants Ignore
By-Laws Required to Protect the Safety of the Residents & Condominium**

35.    The ASSOCIATION's By-Laws, Article III, Section 1, requires the ASSOCIATION to

hold an annual meeting and conduct Board of Director elections each calendar year (**Exh E**, p 9)

and  Article II, Section 4 mandates annual elections for Association directors, with 8 or 7

directors elected each year for 3-year terms. *Id*, p 6.

36.    Notwithstanding the annual election requirements, the Association has not held an election

for directors since November, 2019.

37.    As the DCA Order described above found, Article II, Section 1 and Article III, Section 8(b)

provides an unwieldy scheme to elect directors by owners on each floor voting only for a director

for their floor (*Id.* pp 2, 6).  Thus, each director is elected by a majority vote of different amounts

of owners of 5 to 9 owners on each of the 23 floors, creating a 23-member board of directors,

serving staggered 3-year terms elected by disproportionate amounts of owners.

38.    Article II, Section 15 authorizes the 23-member board to appoint an executive committee

of at least 3 members with authority to perform duties of the board between board meetings, *Id.* p

8, while Article III, Section 8(a) gives each unit owner one vote per unit. *Id*. p 10.

39.    The aforesaid voting scheme for election of directors contradicts and defeats the By-Law's

provision of <u>one vote per unit</u> by diluting the votes of unit owners on floors having more units

(i.e. 9 units), making their votes worth less than unit owners on floors with only 5 units.

**The 23-Member Board is Non-Existent, and Whatever Members
Purportedly Exist are Ignorant and Could Care Less About Their Duties**

40.    The By-laws establishing a 23-member board creates a non-functional board that fails to

coordinate the 23-members for elections and obtain a quorum at all board meetings.

41.    Minutes of purported board meetings state that the names of the directors present appear on an attached list, but no list is attached, so no evidence of a quorum having been present exists, nor do the minutes state a quorum existed.

42.    The purported 23-board members never officially communicate with Plaintiff and other owners, there is no way to communicate with them, and at meetings they never identify themselves.  In fact, Plaintiff's floor board member Defendant BLUMENTHAL never communicates with the residents on the floor, was never voted for in years and is not liked by any one on the floor, yet she touts herself as a Board member and "votes" for important decisions for the Condominium without authority.

43.    Indeed, as stated above, 18th Floor Board member Rajiv Lakhaney confirmed Defendants do not notify Association members or others of board meetings, and nothing in the sparse board meeting minutes indicates proper notice of the meetings was given to the directors (**Exhibit F).**

44.    On March 11, 2020, Plaintiff and some 15 other owners who requested the Association follow the law, including Howard Meltzer and Eric Barsegian, attended a meeting that Defendants called after they discovered owners were petitioning to remove Defendants and management.

45.    To intimidate attendees, Defendants wasted more Association funds to hire a videographer which backfired as Defendants were the only parties cursing, screaming and engaging in verbal and physical altercations while Plaintiff and the owners professionally addressed their rights to nominate and vote for a Board and amend the By-Laws to eliminate the unwieldy and non-existent 23-member board to a manageable number, such as the generally accepted five-member board, but Defendants absolutely refused the owners' requests and countered  by cursing and screaming at owners to make them feel defeated until the owners left.

46. On December 12, 2020, to further deceive the 183 unit owners, Defendants belligerently used the DCA Order as an excuse to refuse scheduling an election by falsely stating in a memo, Defendants <u>sent via the wires by email</u> to owners located interstate, that the Order prohibits them from allowing owners to vote, when in fact it directs them to hold an election pursuant to the law (**Exhibit G**).

47. Notwithstanding the demands by the Association Members and the DCA Order, the Association continues to refuse to revise its director-election scheme to comport with the statute

48. Defendants refusal to schedule director elections for two years and conform the elections to PREDFDA mandating each Association member to vote for all directors (a) constitutes disenfranchisement of the Association Members, (b) violates statutory requirements and is contrary to law, (c) breaches contracts (i.e. By-Laws), (d) breaches fiduciary duties, and (e) is contrary to the general welfare of the Condominium owners and residents.

49. The continuation of an unworkable and non-functioning 23-member board of directors, never voted in by law in the first place, interferes with Plaintiff's right as an Association Member to fairly select representatives and be properly represented on and by the Association's board.

### COUNT I – INJUNCTIVE RELIEF & RECEIVER

50. Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

51. All of the aforesaid conduct is causing and causes irreparable harm to Plaintiff as she has lost the use of her property as a direct result of Defendants illegal conduct, her rights under the law are violated by Defendants continuing to act as Board of Directors and an Executive Board making financial and other decisions to the detriment of Plaintiff and her property, and all such decisions and acts by Defendants are illegal, null and void as Defendants were never voted in as a Board while they act contrary to State laws to abuse the Association for their own self-interests of profiting therefrom, whether by their illegal cabinet making business, favors from vendors or

not paying fees that other owners must pay and Defendants VERDE-STEINBERG's excessive and unnecessary fees to fight the state despite owners demanding they follow the law.

WHEREFORE, Plaintiff demands the following relief:

a)   A permanent injunction compelling the Association to (a) revise its By-Laws to reduce the board of directors from 23 members to five members, (b) provide Plaintiff with the names and addresses of all board members and the actual notices to vote and votes for all such members for each of the past ten years, (c) revise the director-election scheme to comply with N.J.S.A. 45:22A-45.2c(7) and allow each Association member to vote for all directors, and (d) bar defendants Perlman, De Hegedus, Segal and Blumenthal and Defendant Does from running for future elections.

b)   A permanent injunction compelling the Association to hold an election under State laws.

c)   Appointment of a receiver or other neutral unaffiliated with the Association to oversee and conduct an election in a fair and impartial manner.

d)   Compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT II – FAILURE TO LAWFULLY OPERATE ASSOCIATION

52.   Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

53.   Despite the By-Laws Article III, Section 1 and Article II, Section 4 and Article II, Section 8  (**Exh E,** pp 6,7,9) to hold an annual meeting, have the Board of Directors meet at least four times a year and conduct Board of Director elections each calendar year, the Defendants have not met as required nor held an annual meeting or elections since 2019.

54.   Section 13(a) of the N.J. Condominium Act, N.J.S.A. 46:8B-13(a), requires that, with the exception of certain specified topics, all binding votes of the Board of Directors be taken at a meeting of the Board open to all Association Members, providing Members adequate advance notice and minutes of meetings are taken and made available to Association Members, before the next open meeting.  Defendants ignore these responsibilities for the past six years to date.

55.     Section 8.12(a) and (c) of PREDFDA, N.J.A.C. 5:26-8.12(a) and (c) requires that "[t]he bylaws of the association shall include a requirement that meetings of the executive board where a binding vote of the executive board is to be taken shall be open to attendance by all association members …." and  "adequate notice of at least seven days prior to any such meeting shall be given to all association members." Defendants ignore these laws for the past six years to date.

56.     Defendants violate Article II, Section 8 of the By-Laws by failing to hold at least four meetings of the Board of Directors for several years and have violated N.J.S.A. 46:8B-13(a) and N.J.A.C. 5:26-8.12(a) and (c) by failing to conduct binding votes at open meetings of the Board of Directors and failing to give Association Members timely notice of open Board meetings.

57.     Section 8.12(d) of PREDFDA, N.J.A.C. 5:26-8.12(d), states, "Every elected board member shall be provided equal opportunity to participate in any meeting of board members and Article II, Sections 8 and 9 of the By-Laws requires every director be given at least three business days notice of Board meetings (**Exh E,** p 7).

58.     Defendants fail to give directors notice of Board meetings, thereby preventing directors from participating in Board meetings, in violation of PREDFDA and the By-Laws Article II, Section 8.

59.     Article II, Section 15 of the By-Laws (**Exh E,** p 8) states in part:

> The Board of Directors may, by resolution duly adopted, appoint an Executive
> Committee to consist of three (3) or more members of the Board of Directors ….
> Such Executive Committee shall have and may exercise all the powers of The Board
> of Directors in the management of the business and affairs of the Condominium
> during the intervals between the meetings of the Board of Directors insofar as may be
> permitted by law [except for certain enumerated powers of the Board].

60.     Contrary to the By-Laws Article II, Section 15, Defendants establish an Executive Committee of a number of directors less than those constituting the full Board who occasionally meet and render decisions pertaining to operating the Association.

61.     The By-Laws Article II, Section 15 is contrary to law and public policy because it

(a) violates N.J.A.C. 5:26-8,12(d) requiring all Board members to participate in all meetings ;

(b)  undermines the By-Laws Article II, Section 8(a) that each unit owner have one vote by replacing the governing authority of the 23 Board members with the authority of fewer Board members who were elected by fewer of the Association Members; and

(c)  enables a minority of directors to overrule or overturn decisions made by the full Board.

62.    The failure of the Association to abide by the Radburn Act and its own By-Laws to hold annual elections and Board meetings invalidates the authority of the directors to act as the governing Board, and every action, contract, rule, amendment or notice they have engaged in as a "Board" is null and void and illegal.

63.    Additionally, Section 5-24b of the N.J. Non-Profit Corporation Act, N.J.S.A. 15A:5-24b, states, "Upon the written request of any member, the corporation shall mail to that member its balance sheet at the end of the preceding fiscal year, and its statement of income and expenses for that fiscal year."

64.    Article IX of the By-Laws (**Exh A,** p 24) states in part,

An annual report of the receipts and expenditures of the Condominium audited by an independent certified public accountant, shall be rendered by the Board of Directors to all Unit Owners, promptly after the end of each fiscal year. The cost of such report shall be paid by the Board of Directors as a Common Expense.

65.    Despite their obligations by statute and the By-Laws, and despite Plaintiff's and other owner requests, Defendants never mail financials or any notices for the past ten years and failed to produce copies of the Association's audited financial statements for fiscal year 2020 to prevent owners from exercising their right to review and understand how their money paid to the Association is being spent by Defendants.

66.    Such conduct is causing and, if allowed to continue, will continue to cause irreparable harm to the plaintiffs and the other Members of the Association.

        WHEREFORE, Plaintiffs demand the following relief:

 a)     A declaratory judgment that the provision authorizing the Board of Directors to create an Executive Committee to act in place of the Board is void as contrary to law and public policy;

b)   A preliminary and permanent injunction preventing the Association's Executive Committee from acting in place of the Board of Directors;

c)   A preliminary and permanent injunction compelling the Association to hold at least four Board of Director meetings annually and an annual election of directors;

d)   A preliminary and permanent injunction compelling the Association to comply with the requirements of N.J.S.A. 46:8B-13(a) for open meetings of the Board of Directors and notice to the Association Members pursuant to N.J.A.C. 5:26-8.12.

e)   Appointment of a receiver for the Association to manage and oversee the operation and financials of the Association during this litigation.

f)   A permanent injunction compelling Defendants to provide Plaintiff and all owners copies of the audited financial statements for the Association for fiscal year 2020.

e)   Compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

### COUNT III – FAILURE TO MAINTAIN CONDOMINIUM
### BREACH OF FIDUCIARY DUTIES

67.    Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

68.    The Condominium is promoted and advertised as a luxury "white-glove" condominium.

69.    Pursuant to Section 14(a) of the N.J. Condominium Act, N.J.S.A. 46:8B-14(a), the

Association is obligated to perform "[t]he maintenance, repair, replacement, cleaning and

sanitation of the common elements."

70.    The By-Laws Article V, Section 10 (**Exh E,** pp 16,17), entitled "Maintenance and

Repairs," states in pertinent part:

> (b) All changes, alterations, improvements, maintenance, repairs and replacements to the Common Elements and Limited Common Elements, whether located inside or outside the Units (unless necessitated by the negligence, misuse or neglect of a unit Owner, in which case such expense shall be charged to such Unit Owner), shall only be made by the Board of Directors and be charged to all Unit Owners as a Common Expense. …

> (c) Windows and window frames located in units are considered Limited Common Elements. Unit Owners shall have the responsibility for cleaning the interior of the windows and window frames. The Association shall arrange for the exteriors of Unit windows to be cleaned by licensed window washers. Unit Owners may not clean the exteriors of windows themselves. Replacement of broken window glass shall be performed by the Association, but the expense

therefore [sic] is payable by the Unit Owner.  However, repairs to window frames and mechanisms may only be made by the Association, and shall be charged to all Unit Owners as a Common Expense.

(d) Doors to Units, balconies and terraces shall be kept in a clean and safe condition by the Unit Owner, as set forth in Section 11 below.  However, only the Association may alter, change, improve, maintain, repair or replace said doors, balconies and terraces.

71. Article V, Section 11 of the By-Laws (**Exh A,** p 17), entitled "Limited Common Elements,

states in pertinent part:

The following portion [sic] of the Common Elements will be irrevocably restricted Limited Common Elements:

The balcony or terrace appurtenant to a Unit shall be for the exclusive use of the owner of such Unit, his or her tenants, guests or invitees. …

Entrance doors to Units opening from common corridors into a Unit shall be Limited Common Elements appurtenant to that Unit, and doors from Units to balconies and/or terraces appurtenant to said Unit shall be considered part of the Limited Common Elements.  All such doors shall be maintained and repaired only by the Association, in accordance with applicable laws, regulations, these By-Laws and/or architectural standards established by the Board.

All repairs and maintenance of terraces and balconies shall be the sole responsibility of the Association. …

72.     Despite these obligations, and in violation of <u>N.J.S.A.</u> 46:8B-14(a) and the By-Laws

Article V, Sections 10 and 11, Defendants fail and refuse to maintain, repair and replace

Common Elements and Limited Common Elements and fail to maintain the luxury quality of the

Condominium;  allowing it to fall into disrepair, for example, but not limited to, the following:

a.   Defendants refuse to repair Limited Common Element balconies, balcony doors and window frames, that are almost 30 years old, to eliminate the intrusion of unbearable noise and cold air into units, as represented in a video taken by Plaintiff in her unit in April 2020 at https://youtu.be/eoDJOFEF7Ws , being the same noise and cold wind entering her unit every year for months that Defendants refuse to address her complaints for them to repair;

b.   Defendants refuse to inspect and repair balcony railings and cement floors for cracks, waterproofing, and the rebar supports, or upgrade them for nearly 30 years when other area community associations refurbished their unit balconies;

c.   Defendants assess some but not all Unit Owners $500.00 to replace Limited Common Element unit entry door handles that are the Associations' responsibility, but misrepresent that all 183 Unit Owners will pay that amount;

d.   Defendants refuse to repair the building ventilation system to prevent cigarette smoke from units occupied by smokers intruding into other units, creating unsafe and toxic conditions (**Exhibit H**);

e.   Defendants fail to repair the lobby wall fountain, leaving an eye-sore of on-going construction and tarpaulins in the lobby for years;

f.   Defendants fail to repair the lobby air conditioning, leaving it inoperable for approximately eight weeks in the summer 2021 and into the fall;

g.   Defendants fail to repair the security entrance gate that is left open most times and sometimes held open by unsightly rope;

h.   Defendants allow security guards to sleep, play games on their phones, and have personal phone conversations during work;

i.   Defendants fail to properly maintain, repair or replace the elevators and allow repeated breakdowns and damage despite having a multi-million dollar repair contract years ago;

j.   The common areas, library, and lobby furnishings are dirty and have not been renovated since 1994, almost 30 years ago;

k.   Although the 2017 and 2018 financial statements show significant costs of $82,484.00 in 2017 and $154,484.00 in 2018 to repair air conditioner units**,** the air conditioners frequently fail and are under repair despite those substantial expenses.

73.   Defendants failure to properly maintain the Condominium constitutes a breach of their statutory duties, breach of contract, and breach of their fiduciary duties.

74.   As a direct result of Defendants failures and misconduct, Plaintiff suffers damage to herself and her property damages and irreparable harm and, if not corrected, will continue to cause irreparable harm.

WHEREFORE, Plaintiff demands the following relief:

a)   Appointment of a receiver for the Association to investigate, manage and oversee the maintenance and repair of the Condominium during this litigation.

b)   A permanent injunction compelling Defendants to implement a timely investigation and repair of the deficiencies throughout the condominium.

    c)  Compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

**COUNT IV – FAILURE TO PROMOTE AND PROTECT
THE SAFETY AND WELFARE OF PLAINTIFF**

75.    Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

76.    The By-Laws Article III, Section 3 and PREDFDA Section 8.11(d), <u>N.J.A.C.</u> 5:26-8.11(d), authorize Unit Owners to petition the Board of Directors to hold a special meeting to seek the removal of directors (**Exh E** p 9).

77.    In the first week of March, 2020 and continuing thereafter, Association Members signed a petition that sought to remove the purported directors and management (**Exh B**), and Defendants responded with verbal and physical assaults against Plaintiff and others, and threatening to use Association funds to sue Plaintiff and petitioning owners.

78.    Such threats and assaults were intended to, and did, discourage owners from signing the petition and interfered with the rights Plaintiff as a Unit Owner to petition, as set forth in the By-Laws and the PREDFDA regulations.

79.    To further intimidate and frighten Plaintiff and Unit Owners from enforcing their statutory and other rights, Defendants showed how absolutely brazen they will be to damage residents and invade their privacy as they disclosed Plaintiff's and other Unit Owners private information to other Unit Owners and the public, and spread false rumors about Plaintiff and others to create dissension and vilify owners among each other to discourage them from gathering to petition, including, but not limited to, the following:

    a.    On March 5, 2020 and for days thereafter, defendants published and distributed to all 183 Unit Owners a three-page letter signed by defendant Perlman, acting as the Board president, regarding Plaintiff and used Association employees during their work hours to place that letter under all Unit Owners doors twice and distributed it to every person, stranger or resident, entering the building, and  posted it permanently on the Lobby notice board for all strangers, delivery-persons, visitors, Unit Owners and others entering the building to read [2].  That

---

[2] The letter is not republished here so the libel against Plaintiff and her private information is not republished in this public filing.  It will be provided to the court *in camera*.  Defendants should not republish it and

letter disclosed Plaintiff's residence address and the car she drives to insure people identify her and her car to target her in and out of her residence.  The letter also made false and salacious personal attacks against her, unrelated to Association issues, falsely accusing her of failing to pay common expense assessments, yelling at people, using common areas to operate her business, and causing an investigation by the DCA when defendants knew she was not the only resident who filed a complaint (which the DCA validated the complaints- see **Exh E**).  The defendants also singled Plaintiff out to demean her to all Owners and arouse the Owners against her by accusing her of causing them to pay legal fees because of the DCA complaint when in fact the defendants are the cause of the fees as they are operating illegally and using Defendants VERDE-STEINBERG to protect their illegal operation.

b.      Such disclosures were made despite Plaintiff's written instructions since 2007 to the Association and its staff that her name and address should not be provided to anyone and that defendants and their employees should not accept packages sent to her in order to protect her privacy and security because she is a legal commentator for media outlets.

c.      As a result of defendants publishing Plaintiff's private information and their salacious and false accusations against her, Plaintiff received threatening calls, and her car parked in the Association garage was vandalized during the height of the Covid pandemic from August through October, 2020, by persons throwing dirty, used latex gloves (worn for Covid protection and potentially contaminated) at her car, putting her in fear of contracting the disease, which at the time, the public was warned Covid could spread through objects.

d.      Furthermore, as detailed below, Defendants verbally and physically assaulted Plaintiff for years and encouraged the assaults by others.

e.      Defendants ignored Plaintiff 's complaints about these invasions of her privacy and the threats to her safety and took no action to prevent the retaliation against her.

f.      Rather, Defendants encouraged the harassment.  For example,  on March 7, 2020, Defendant ERMOIAN contacted Suzanne Toufayan to disparage Plaintiff, then refused to respond to Ms. Toufayan's email that day directing Ermoian to stop harassing residents.

g.      On March 11, 2020, Defendant PERLMAN told Unit Owner Eric Bosegian that Plaintiff is crazy and deserved to be harassed.

h.      Gossip about residents and Owners is Defendants pattern and practice to divide owners.  At other times, defendants AVELLO and ERMOIAN told Plaintiff  that a unit owner

respect sending it *in camera* , otherwise another count of libel and punitive damages will be added against defendants for republishing it.

they identified to her is mentally ill, another female attorney in the building is a "hoarder", another female attorney had mental issues and was not paying her fees, and Defendant ERMOIAN told Plaintiff that a male resident who wanted to rent Plaintiff's apartment some years ago was a "dead beat" and does not pay his rent.

i)    in retaliation of the Petition owners signed, as described above, Defendant ERMOIAN deliberately violated New Jersey criminal law 2C:28-4 by filing a false police report falsely incriminating Plaintiff of spilling tomato sauce in front of ERMOIAN's door at Unit 12B in March, 2020 -temporal to the petition signing against ERMOIAN - which Plaintiff discovered said false report in August, 2021.

80.  Defendants also either directly or through the Association's agents, repeatedly threaten and assaulted Plaintiff for years, including but not limited to the following incidents:

a.    After Plaintiff 's inquiry at a November 21, 2019 meeting regarding defendants refusal to let owners vote, the Defendant VERDE-STEINBERG's Mr. Van Eck intervened by screaming at Suzanne Toufayan's husband, "Stop staring at me.  You're harassing me," to intimidate attendees from asking questions.

b.    At that meeting, Suzanne Toufayan's husband informed the Board that his car tires were slashed in the Association's garage in retaliation to their complaints about mismanagement to defendant Avello.

c.    At a meeting on March 11, 2020, in response to Unit Owners' requests to vote, Defendants screamed and cursed at residents to move out, particularly Defendant DE HEDEGUS' had his wife curse and scream at Plaintiff and others to "Move OUT!", and Defendant VERDE-STEINBERG's Lou Verde screamed at everyone in the most unhinged manner to frighten attendees from requesting their voting rights.

d.    When Plaintiff spoke at the March 11, 2020 meeting, Defendant WENDY SEGAL, a purported Board member, interrupted her by screaming, "I want that bitch out," and charged at Plaintiff from the front of the room all the way to the back where Plaintiff stood, with the intent to strike and batter Plaintiff, but when Plaintiff stepped back to avoid SEGAL's beating, SEGAL then grabbed the door next to Plaintiff and slammed it with such violent force to batter Plaintiff that when Plaintiff again moved away, the door slammed back open and broke. All of which was witnessed and reported to the police that day by Plaintiff and the witness **(Exhibit I)**

e.  Verbal and physical assaults are defendants pattern and practice as in 2012 they had defendant BLUMENTHAL's husband curse at Lask at meetings she attended and in the lobby, calling her, among other things, a bitch, ugly, whore, yelling that defendants wanted her dead and spit at her to terrorize and humiliate her in front of her neighbors, and he published her address, car she drove and license plate to anyone entering the lobby as he asked them to destroy her property and harm her. Defendant BLUMENTHAL's husband admitted his attacks to the police (**Exhibit J**- police and witness reports)

f.  The other defendants observed SEGAL's the attack and took no action to prevent it or punish her, just as they permitted, encouraged and organized the attacks in 2012 against Plaintiff because Defendants intend to and do cause damage and harm to Plaintiff and her property by their illegal operation and conduct.

81.  Soon after the November, 2019, defendant Ermoian told plaintiff Suzanne Toufayan that defendant Avello asked, "Are all Armenians like this?"   Plaintiff was also subjected to derogatory comments by ERMOIAN because of her race, and another owner in the building was called the "N" word by staff.

82.  The comments constitute a derogatory statement directed to a particular ethnic group and such ethnic harassment constitutes a violation of the Federal Fair Housing Act, 42 U.S.C.A. §3601, *et seq.* and the N.J. Law Against Discrimination, N.J.SD.A. 10:5-1, *et seq.*

83.  As previously described, defendants fail and refuse to take action regarding the intrusion of toxic smoke into  Condominium units despite Plaintiff's complaints for over eight years and defendants' admit the toxic smoke exists, is a serious health hazard that will cause cancer and cardiac disease (**Exh H).**

84.  Also, as previously described, defendants fail to assure the proper function of the security gate and conduct of the security guards, thus exposing Plaintiff and residents to security risks.

85.    Defendants unwarranted disclosures of Plaintiff's private information and their harassment, including ERMOIAN's false police report, caused her extreme distress and forced her to remove her car and abandon her home since October, 2020 to date.

86.    The aforesaid conduct by Defendants constitutes a breach of their statutory duties, breach of contract, and breach of their fiduciary duties and causes Plaintiff damages and irreparable harm and, if not corrected, will continue to cause irreparable harm.

WHEREFORE, Plaintiff demands the following relief:

a)    Appointment of a receiver for the Association to manage and oversee the operation of the Association during this litigation.

 b)    A preliminary injunction and permanent injunction prohibiting defendants from threatening or attacking Unit Owners for exercising their legal rights and prohibiting defendants from revealing private information about Unit Owners to others.

 c)    A preliminary and permanent injunction barring defendants Perlman, De Hegedus, Segal and Blumenthal from running for re-election.

 d)    A permanent injunction prohibiting defendants from violating the Federal Fair Housing Act, 42 U.S.C.A. §3601, et seq. and the N.J. Law Against Discrimination, N.J.SD.A. 10:5-1, et seq.

 e)    A permanent injunction compelling the defendants to implement timely investigation and repair of the stated deficiencies

 f)    Compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT V – MISAPPROPRIATION OF CORPORATE ASSETS

87.    Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

88.    For years and up to 2021, Defendants had their maintenance man operate an illegal cabinet-making business for profit in the Condominium basement, using Association common areas, machinery and supplies for his personal profit and, upon information and belief, Defendants received monetary and other benefits from that illegal business.

89.    Also, residents of the Condominium must pay $105 monthly for parking, but ERMOIAN

parks free at the premier top level of the parking garage 365 days a year at all hours under the

pretense that she is an employee when she is not full time employed, and she parks there when

she is not working nor does she pay for a resident parking space although she is a Unit Owner.

90.    Article II, Section 13 of the By-Laws states that no member of the Board of Directors is

to be compensated (**Exh E**, p 8).

91.    Nevertheless, Defendants assign for their exclusive use premier parking spaces on the

garage's upper level, and in April 2021 spent Association funds to build a mechanical gate to

block those spaces from use by others, as Defendant ERMOIAN parks for free, as shown below:



*Gate built 4/2021*                              *ERMOIAN's Grey car parked free behind gate*

92.    The assignment of premier spaces and installation of a gate to prevent use by others

constitutes compensation in violation of Article II, Section 13 of the By-Laws.

93.    In 2019, Defendant AVELLO admitted to Plaintiff that for years he had another paying

job at an association next door, the Kensington, while he was paid to work full time for the Royal

Buckingham Condominium Association, which constitutes a misappropriation of Association

funds in that he receives a full-time salary from the Association while splitting his time at

another job at the same time.   And, as explained above, Defendants allowed the maintenance man to operate an illegal cabinet business using Association common areas, equipment and supplies during hours he was paid to work full-time for the Association, all of which constitutes a misappropriation of Association funds.

94.    Furthermore, the Association's financials show inexplicable expenses that defendants refuse to explain to Plaintiff despite her requests, such as:

a.  The 2009 financial statements show at page 10, note 9, the Association adopted a 401(k) plan for full-time employees, but Defendants refuse to inform Plaintiff, despite her requests, what employees receive that benefit and how much has been taken from owner's maintenance for that plan since 2009, which appears to be hundreds of thousands of dollars over the years that could have been used towards needed building repairs (**Exhibit K-** financials referred herein and below).

b.  The 2019 financials, page 3, list exorbitant salaries of  $839,911 for "payroll & related expenses (Note 11)", which defendant Avello told plaintiff Lask comprised the salaries of only full time employees, that is, Avello, the doormen, the superintendent and his assistant. However, despite requests, defendants have refused to disclose the employees' specific salaries and so have failed to justify this exorbitant amount.

c.  In addition, the 2019 financial statements list an incredible $88,581.00 as "Office and Administration" expenses for a one-person office staffed by defendant AVELLO with a part-time assistant, defendant ERMOIAN, both of whom are frequently absent and non-responsive.

d.  The 2019 financials, at page 3, also list a huge $480,674.00 fee for  "Porter service" despite a small staff of porters.

e.    By 2018, the financials show a $247,624.00 deficit in the Operating Fund and that defendants used $789,208 of Replacement Funds for  "Major Repairs/Expenditures", contrary to good accounting practice.

95.    Defendants' mismanagement of the Association's expenses, as demonstrated by their inability and refusal to explain the details of these expenses, has resulted in frequent special assessments to cover shortfalls, placing a substantial financial burden upon the Unit Owners. Specifically, defendants imposed a $700,000 special assessment in 2008 for 36 months, paid by

all Owners .  The 2011-2012 financials at page 7, Note 5 show another special replacement fund of $1,250,000.00 paid by all owners over 36 months, commencing February, 2012.  And yet again, the 2018 financials, Note 9, show defendants entered into a $1.2 Million Dollar elevator repair contract and imposed a 10-year assessment against all Unit Owners.

96.     At a September 20, 2021 Zoom meeting, attended by Plaintiff, Suzanne Toufayan, and others where Defendant AVELLO admitted that defendants failed to repair the elevators properly, causing the Association to enter into yet another annual contract with a vendor at the Owners' expense to repair the elevator interiors because the issue had not been fixed when defendants had entered into the $1.2 million dollar elevator contract years ago.

97.     Despite these high costs and the high common expense assessments imposed upon the Unit Owners, the Owners do not receive the "white-glove" building and amenities or the quality management services for which they pay a high price.

98.     Defendants also seek to prevent Plaintiff from investigating their actions, obtaining explanations of the financial situation, and question the Association's financial condition by ignoring her repeated requests for minutes, financials, and names of board members.

99.     The aforesaid conduct by defendants constitutes breach of their statutory duties, breach of contract, and breach of defendants' fiduciary duty.

100.    Such conduct directly caused Plaintiff damages and irreparable harm and, if not corrected, will continue to cause irreparable harm.

          WHEREFORE, Plaintiff demands the following relief:

a)  An order compelling Defendants to provide an accounting of the dates that the maintenance worker utilized the basement to build cabinets, the cost of Association supplies he used, and the amount of income he received.

b)  An order compelling Defendants to provide an accounting of the costs expended for the installation and operation of the gate for their premier parking spaces, the names and addresses of all persons parking behind that gate, the dates they utilized said parking spaces, the value of the parking spaces, and amounts paid for use of the parking spaces.

c) An order compelling Defendants to provide an accounting of the dates Defendant Ermoian used her parking space at no cost, the value of such parking space and proof of any time she paid for a parking space during her residence in the Condominium.

d) An order compelling Defendants to provide an accounting and all supporting material, receipts, bills, checks and accounts directly attributed to the management office and the expenses it claims on the financials for the past five years.

e) An order compelling Defendants to provide all employment contracts and any amendments thereto for the past five years for all employees of the Association, including, but not limited to, Defendants AVELLO, ERMOIAN and maintenance men.

f) A permanent injunction prohibiting the use of Condominium common areas for a private business by Defendants, their agents and Condominium employees.

g) A permanent injunction prohibiting the preferential assignment of parking spaces to Defendants and their agents.

h) Compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT VI – FDCPA VIOLATIONS & RETALIATORY FALSE FEES

101. Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

102. As part of their harassment and retaliation against Plaintiff, Defendants added thousands of dollars of unwarranted fees to her monthly bill for common expense assessments (maintenance fees), falsely claiming she carries a delinquency on her account since 2019.

103. Such charges are intended to harass and retaliate against Plaintiff.

104. Defendants deliberately refuse to address and remove the false charges despite Plaintiff's numerous communications to Defendants AVELLO and ERMOIAN who refuse to respond and force Plaintiff to communicate only with Defendant VERDE-STEINBERG so that Defendant can profit by charging unnecessary fees taken from Association funds when it is Defendants AVELLO and ERMOIAN's job to respond.

105.    Defendant VERDE-STEINBERG are attorneys who regularly engage in consumer-debt-collection activity and they state they are debt collectors in their email communications to Plaintiff from February to April, 2021 in response to her raising the false charges to them.

106.    Under the FDCPA, Plaintiff is a consumer paying association fees to Defendants that includes her cable and internet fees, and are consumer services, which Defendants charge Plaintiff  false additional "late fees" since November, 2019 to date amounting to thousands of dollars for those consumer services, while VERDE-STEINBERG continues the fraud by demanding collection of those false and disputed fees via the wires by e-mail.

107.    In violation of FDCPA 15 U.S.C.§1692g, VERDE-STEINBERG failed within 5 days after their initial communication with Plaintiff, as the consumer regarding the collection of the alleged debt, send a written notice stating the debt amount, name of the creditor, a statement that within 30 days the debt will be valid after receipt of the notice unless Plaintiff disputes it, a statement in writing that if disputed then the debt collector will obtain verification of the debt and mail it to the consumer and a statement that within the 30 day period the debt collector will provide the Plaintiff with the name and address of the original creditor if different from the current creditor and (b) VERDE-STEINBERG never mailed verification of the debt to Plaintiff

108.    In violation of FDCPA §1692e, Defendant VERDE-STEINBERG used false, deceptive, or misleading representations or means in connection with the collection of the debt because the debt does not exist, and in violation of  §1692g(b) Defendants refuse to cease the collection or mail verification of it, knowing it's false and disputed.

WHEREFORE, Plaintiff demands judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

### COUNT VIII – FALSE LIGHT

109.    Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

110.   As explained in paragraph 79 herein above, Defendants' published a March 5, 2020 three-page letter to the public that gave publicity to a matter concerning Plaintiff that placed her before the public in a false light, including stating she screams and chases people in the building, she abuses building areas, that she was the only complainant to the DCA when she was not, that she is the only complainant in flyers distributed about issues in the building when she was not, that because of Plaintiff maintenance fees for the Condominium will increase and that she does not pay her maintenance fees.

111.   Such statements placed Plaintiff in a false light and gave the false public impression of Plaintiff by making major misrepresentations of her character, history, activities, and beliefs, which is highly offensive to reasonable persons.

112.   In publishing and distributing the said letter, Defendants had knowledge of and/or acted in reckless disregard of the falsity of the publicized matter and the false light in which Plaintiff would be placed.

113.   Defendants made said statements to give a false public impression of Plaintiff to impugn and discredit her character, history, activities, beliefs, and objectives and to attempt to cause her harm and distress and as a proximate result of such conduct, Plaintiff suffered damage.

WHEREFORE, Plaintiff demands judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT VIII – INVASION OF PRIVACY

114.   Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

115.   Defendants' publication of the March 5, 2020 three-page letter was an intentional intrusion, physically or otherwise, upon the solitude or seclusion of Plaintiff and her private affairs or concerns that is highly offensive to a reasonable person.

116.    Defendants knew Plaintiff possessed a reasonable expectation of privacy in matters and concerns pertaining to her occupancy as an owner based on common-sense and the fiduciary duty that management and the Board owe to owners, and also because Plaintiff expressly instructed, since  2007 and again in 2012 to date (which is on Defendant's computers and the doormen's computers) that the Association and its staff should not disclose to anyone her residence, private information nor accept packages or mail for her.

117.    There was no legitimate reason for Defendants to make those disclosures other than to impugn and discredit her character, history, activities, beliefs, and objectives and to cause her harm and distress.  As a proximate result of such conduct, plaintiff Lask has suffered damage.

WHEREFORE,  Plaintiff demands judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT IX – ASSAULT BY SEGAL AGAINST PLAINTIFF LASK

118.    Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

119.    At the March 11, 2020 meeting, Defendant SEGAL intended to cause a harmful or offensive contact with Plaintiff and/or create an imminent apprehension of such contact when she charged at Plaintiff screaming "I want that Bitch out!" with the intent to strike Plaintiff and violently slammed the door in plaintiff Lask's face.

120.    Plaintiff was put in imminent apprehension of such contact by Defendant SEGAL's conduct and as a proximate result of such conduct, Plaintiff has suffered damage.

WHEREFORE, plaintiff Lask demands judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT X – DENIAL OF QUIET ENJOYMENT/CONSTRUCTIVE EVICTION

121.    Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

122.   Plaintiff has the right to quiet enjoyment to her property and to enjoy it in peace, without interference.

123.   The unbearable howling, loud and cold winds from the broken balcony doors and windows that are limited Common Areas the Association must repair, toxic cigarette smoke filling Plaintiff's unit for months at a time every year and Defendants' harassment campaign against Plaintiff denies her the quiet enjoyment of her home.

124.   Defendants' conduct makes clear that they wanted Plaintiff harmed, physically and emotionally, and thereby makes it impossible for her to continue to live in her home.

125.   Defendants' conduct forced Plaintiff Lask to abandon her home in the Condominium on October 15, 2020, continuing to date.

126.   Defendants' conduct constituted an unreasonable interference with Plaintiff 's use and enjoyment of her property, constitutes a breach of the covenant of quiet enjoyment and proximately caused a constructive eviction of Plaintiff, which as a proximate result of such conduct, Plaintiff Lask suffered damage.

WHEREFORE, plaintiff Lask demands judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT XI – NUISANCE

127.   Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

128.   Article V, Section 12, paragraph (b) of the Association's By-Laws (Exh A, p 17) mandates that,

> No nuisances shall be allowed on the property nor such any use or practice be allowed which is a source of annoyance to its residents or occupants or which interfere with the peaceful possession or proper use of the Property by its residents or occupants.

129.   The conditions and actions cited above by Defendants, including hazardous smoke Defendants admit enters her apartment and the disruption of Plaintiff's quiet enjoyment

constitute nuisances and as a proximate result of such conduct, Plaintiff suffered damage to herself and her property.

WHEREFORE,  Plaintiff demands judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

### COUNT XII – EMOTIONAL DISTRESS

130.    Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

131.    Defendants committed the aforesaid acts with the intention to produce emotional distress to Plaintiff with utter disregard for the consequences that may follow, and did occur and harm Plaintiff.

132.    Defendants' conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

133.    Defendants' conduct proximately caused Plaintiff emotional distress and bodily injury, including ongoing trauma and fear, and fear to return to her home.

134.    The emotional distress suffered by Plaintiff is so severe that no reasonable person could be expected to endure it, including but not limited to suffering loss of sleep, loss of self-esteem, humiliation, irritability, loss of the enjoyment and use of her day-to-day activities, a cracked tooth and TMJ due to stress resulting in clenching her jaw starting after the verbal and physical attacks on her in March, 2020 and continuing to date.

135.    As a proximate result of such conduct, Plaintiff suffered damage, including severe physical pain, bodily injury and mental anguish since March, 2020 to date..

WHEREFORE,  Plaintiff demands judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT XIII – NEGLIGENCE

136.     Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

137.     Defendants have a duty to protect the health, safety and welfare of Plaintiff and her property.

138.     Defendants aforesaid conduct of was unreasonable and violated their duty to Plaintiff.

139.     Defendants aforesaid conduct created an unreasonable risk of reasonably foreseeable harm to Plaintiff and her property.

140.     Defendants aforesaid conduct proximately caused physical, emotional and financial harm and damages to Plaintiff and her property.

WHEREFORE,  Plaintiff  demands judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

## COUNT XIV- RICO VIOLATIONS

141.     Plaintiff repeats the foregoing allegations in their entirety as if set forth at length.

142.     At all times relevant hereto, Defendants **PERLMAN**, **DE HEGEDUS, SEGAL, BLUMENTHAL, AVELLO** and **ERMOIAN** are persons who conducted and participated in the enterprise's affairs with Defendant **VERDE-STEINBERG**, and among each other, constituting an "Enterprise" as defined in 18 U.S.C. §1961(4) as a group of individuals and entities associated in fact and engaged in a common purpose, the activities of which affected, interstate and foreign commerce, including illegally seizing control of Plaintiff's property being her unit at the Condominium and her funds to pay to protect her Unit and interest in the Common Elements she has a property right to and seizing control of the Association and its funds for years and obtaining said funds through bank wires and transfers payable to the Association, to misappropriate its funds and conceal how said funds are applied in the Association's financial statements, also sent through interstate wires via email to Plaintiff and other owners, including

operating an illegal cabinet business by larceny of Association funds, property and using its

common elements, which is all referred to hereinafter as the "Association Enterprise."

143.     Defendants constitute an ongoing and continuing organization whose members function

as a continuing unit for the common purpose of achieving its objectives and purposes, which

include (a) enriching the Association Enterprise and its owners, operators, employees, agents and

associates by defrauding, harassing, extorting, and stealing money and property from Plaintiff

and the Royal Buckingham Association and its members; (b) promoting and perpetuating the

Association Enterprise to shield its criminal activities from law enforcement authorities, state

and federal agencies and Plaintiff and other owners by encouraging and assisting that Defendants

are the Board when they are not and are operating in violation of the law, including the Radburn

Act, all of which is done to prevent new Board members voted in by State law to discover the

misappropriation of Association funds and other illegal conduct Defendants continue for the past

ten years to date.

144.     During the past ten years Defendants have more than twice used interstate wires to collect

money from Plaintiff and other Condominium owners and used the wires through emails to send

false and fraudulent information about the operation of the Association, including the fraudulent

December 2020 memo above stated that the DCA Order prohibits the Association to conduct

voting and for years using e-mail to send fraudulent financials of the Association funds, all done

to engender a misplaced trust by Plaintiff and other owners that the Association is operating

legally when it is actually operating illegally, and Defendants have no authority to collect and

control any funds they receive by the wires or otherwise as they are not legally the Association's

Board and were never voted to operate the Association or control its funds,  including taking

money from Plaintiff, coming from interstate banks and wires, and Defendants use said funds

form interstate wires to enrich themselves and reinvest in their Association Enterprise to keep it

going, including paying that money to Defendant VERDE-STEINBERG to assist Defendants' Enterprise and participate, directly and indirectly, in the conduct of the affairs of the Association Enterprise through a pattern of racketeering activity, as defined in U.S.C. § 1961(1) and (5), consisting of multiple acts indictable under 18 U.S.C. § 1343 (wire fraud) and pursuant to 18 U.S.C. § 1951 by Defendants extorting and stealing Plaintiff's property by their aforesaid years of  harassment and physical assaults against her to place her in fear of using her property, against her will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to her person or property, or property in her custody or possession, including her unit and her car.

145.    As a direct result of Defendants RICO actions,  they caused Plaintiff damage to her property in that she has lost the use of it, it has devalued and she is unable to go near her own property to maintain it because Defendants file illegal and false police reports prevent her from using her property.

   WHEREFORE, Plaintiff demands an injunction pursuant to 18 U.S.C. §1964, and judgment for compensatory, consequential and punitive damages and attorney fees and costs to Plaintiff.

### **JURY DEMAND**

      Plaintiff hereby demands a trial by jury as to all issues contained herein as a matter of right, pursuant to F.R.C.P. 38(b)(1) and 38 (c).


Dated:  December 30, 2021            **LAW OFFICES OF JOHN T. BAZZURRO, LLC**
                                     Attorneys for Plaintiff


                                        /s John T. Bazzurro
                              By:_____
                                     JOHN T. BAZZURRO, Esq.